CHEVRON U.S.A., INC., et al., Plaintiffs,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Defendant.

Duke Energy Field Services, L.P., et al., Plaintiffs,

v.

Federal Energy Regulatory Commission, Defendant.

The Williams Companies, Inc., et al., Plaintiffs,

v.

Federal Energy Regulatory Commission, Defendant.

Nos. CIV. A. 01–1580(RCL), CIV. A. 01–1624(RCL), CIV. A. 01–1976(RCL).

United States District Court, District of Columbia.

Jan. 11, 2002.

---

56

Thomas J. Eastment, Melissa E. Maxwell, Baker Botts LLP, Washington, DC, for Chevron U.S.A., Inc.

Charles D. Tetrault, Daniel A. Petalas, Vinson & Elkins LLP, Washington, D.C., Henry S. May, Jr., Vinson & Elkins LLP, Houston, TX, Howard L. Nelson, Senior Counsel, El Paso Corporation, Washington, DC, for Duke Energy Field Services.

James T. McManus, Joseph S. Koury, Kenneth S. Kaufman, Jeffrey G. DiSciullo, Wright & Talisman, P.C., Washington, DC, for Williams Companies.

Dennis Lane, Timm L. Abendroth, Office of the Solicitor, Federal Energy Regulatory Commission, Washington, D.C., for Federal Energy Regulatory Com'n.

## MEMORANDUM OPINION

LAMBERTH, District Judge.

Now before the Court are several dispositive motions in these related, but not consolidated, actions. In particular, each of the plaintiffs has filed a motion for summary judgment against the Federal

Energy Regulatory Commission ("FERC") pursuant to Federal Rule of Civil Procedure 56. In the motions, the plaintiffs assert that there are not any disputed issues of material fact and that they are entitled to judgment as a matter of law. The FERC and the Intervenor–Defendants,[1] on the other hand, have filed their own motions for summary judgment against the plaintiffs, in which they agree that there are no disputed issues of material fact but claim that they are the parties entitled to judgment as a matter of law.[2] In addition, the FERC independently filed a motion to dismiss against each of the plaintiffs pursuant to Federal Rule of Civil Procedure 12(b)(1). In the motions, the FERC argues that the Court does not have jurisdiction to adjudicate the plaintiffs' claims against the agency. Specifically, the agency asserts that the plaintiffs do not have standing to bring the suits, that they have failed to comply with the notice requirements of 43 U.S.C. § 1349, and that the consultation requirements of 43 U.S.C. § 1334(f)(3) do not create a private cause of action. After a thorough review of the parties' memoranda, the applicable law, and for the following reasons, the Court GRANTS the plaintiffs' motions for summary judgment and DENIES the FERC's motions to dismiss and the defendants' motions for summary judgment.

## I. BACKGROUND

In 1953, Congress enacted the Outer Continental Shelf Lands Act ("OCSLA") to address the issue of federal authority over the submerged lands extending seaward from the navigable waters of the United States.[3] 43 U.S.C. § 1301–1356. Congress allocated the primary responsibility of administering the statute to the Secretary of the Interior. 43 U.S.C. § 1334(a) (providing that the Secretary of the Interior shall have the power to "administer the provisions of this subchapter relating to the leasing of the [O]uter Continental Shelf, and shall prescribe such rules and regulations as may be necessary to carry out such provisions."). Other federal agencies such as the FERC, however, also have important responsibilities under the OCSLA.[4]

---

1. The Court granted the Producer Coalition and the Independent Petroleum Association of America ("IPAA") leave to intervene in the cases. The Producer Coalition is an *ad hoc* group of oil and natural gas producers with major investment in oil and gas exploration and production projects on the Outer Continental Shelf in the Gulf of Mexico. For purposes of these actions, the Producer Coalition consists of the following seven companies: Devon Energy Corporation, Dominion Exploration & Production, Inc., Forest Oil Corporation, The Houston Exploration Company, Newfield Exploration Company, Ocean Energy, Inc., and TotalFinaElf E & P U.S.A., Inc. Walter Oil & Gas Corporation, which was considered a member of the Producer Coalition when the Court granted the motion to intervene, is no longer part of this litigation. The IPAA is the nationwide trade association that represents the interests of independent domestic gas and crude oil producers. Many of its members are natural gas producers and

shippers that utilize pipeline facilities located on the Outer Continental Shelf.

2. The Intervenor–Defendants labeled their motion as a motion to dismiss or, in the alternative, for summary judgement.

3. These submerged lands are known as the Outer Continental Shelf ("OCS").

4. The FERC is an independent regulatory commission within the Department of Energy. It is composed of five members appointed by the President with the advice and consent of the Senate. The agency was created by Title 4 of the Department of Energy Organization Act, Public Law No. 95–91 (1977), codified at 42 U.S.C. § 7171 (1994). In addition to its responsibilities under the OCSLA, the FERC administers portions of the Natural Gas Act of 1938 ("NGA"), 15 U.S.C. §§ 717–717z, involving natural gas pipelines. The agency also handles the functions of the former Inter-

In particular, the FERC is specifically mentioned in two subsections of the OCS-LA. First, 43 U.S.C. § 1334(e), which deals with rights-of-way through the submerged lands of the OCS, grants FERC the authority to determine, in consultation with the Secretary of Energy, "proportionate amounts" of oil and gas production to be transported or purchased by pipelines. Second, § 1334(f),[5] which is entitled "Competitive principles governing pipeline operation," refers to the FERC in its three subparts. Section 1334(f)(1) provides that every permit, license, easement, right-of-way, or other grant of authority for the transportation by pipeline on or across the OCS of oil or gas shall require that the pipeline be operated in accordance with certain competitive principles. 43 U.S.C. § 1334(f)(1). These competitive principles include requiring the pipeline to "provide open and nondiscriminatory access to both owner and nonowner shippers." 43 U.S.C. § 1334(f)(1)(A). Subparagraph (1)(B) provides the FERC with the power to "order a subsequent expansion of throughput capacity of any pipeline for which the permit, license, easement, right-of-way, or other grant of authority is approved or issued after the date of enactment of this subparagraph." 43 U.S.C. § 1334(f)(1)(B). Moreover, § 1334(f)(2) allows the FERC to exempt facilities from any of the requirements of 1334(f)(1) if it "feeds into a facility where oil and gas are first collected or a facility where oil and gas are first separated, dehydrated or otherwise processed." 43 U.S.C. § 1334(f)(2). Finally, § 1334(f)(3) provides that the FERC shall consult with the Attorney General on specific conditions to be included in any permit, license, easement, right-of-way, or grant of authority in order to ensure that the pipelines operate in accordance with the competitive principles set forth in § 1334(f)(1). 43 U.S.C. § 1334(f)(3).

In order to effectuate these statutory provisions and, more precisely, "to ensure that natural gas is transported on an open and nondiscriminatory basis through pipeline facilities located on the" OCS, the FERC issued Order No. 639 on April 10, 2000 and Order No. 639–A on July 26, 2000. In accordance with the reporting regulations promulgated in these orders, which are set out in 18 C.F.R. ch. 330, gas service providers[6] must report information regarding service provided during each quarter of the year.[7] Specifically, they must file a description and map of their facilities, a list of their affiliates, and their conditions of service (including the names of the shippers receiving service, the type of service provided, the primary receipt and delivery points, and the rates they charge each customer). 18 C.F.R. § 330.2. To comply with these reporting requirements, the plaintiffs in the instant actions have filed the necessary information with the FERC since October 16, 2000. At the

state Commerce Commission under the Interstate Commerce Act ("ICA") involving oil pipelines. 42 U.S.C. §§ 7172(a) and (b).

5. Congress added § 1334(f) to the OCSLA in 1978.

6. Gas service providers are defined as "any entity that operates a facility located on the OCS that is used to move natural gas on or across the OCS." 18 C.F.R. § 330.1

7. Four types of facilities are exempt from these reporting requirements: gas service providers that serve exclusively one customer (either itself or another party), § 330.3(a)(1); gas service providers that serve exclusively shippers with ownership interests in both the pipeline facilities operated by the service provider and the gas produced from a field or fields connected to that single pipeline or pipelines, § 330.3(a)(2); any pipeline which feeds into a facility where gas is first collected or a facility where gas is first separated, dehydrated, or otherwise processed, § 330.3(a)(3); and gas service providers' facilities and services that are regulated under the Natural Gas Act, § 330.3(a)(4).

same time, pursuant to 18 C.F.R. § 388.112, the plaintiffs also have requested confidential treatment for certain commercially sensitive information submitted to the agency.

After the plaintiffs began filing their reports with the FERC, the Producer Coalition requested that the agency disclose the allegedly confidential contract information. Even though the Producer Coalition subsequently narrowed the scope of its Freedom of Information Act request, the FERC issued Order on Request for Confidential Treatment, 96 F.E.R.C. ¶ 61,296 ("Disclosure Order"), on September 13, 2001. The order provided that the information the plaintiffs submitted to the FERC would not be treated as confidential and accordingly would be released within five days.[8] Moreover, on October 12, 2001, the FERC issued an Order Clarifying Prior Order, 97 F.E.R.C. ¶ 61,040 ("October 12 Order"). In that order, the FERC stated that the Disclosure Order of September 13, 2001 would not be limited by the narrowed scope of the Producer Coalition's request for information. That is, the FERC found that the pending confidentiality requests "presented insufficient grounds to support continued confidentiality in light of OCSLA's open access requirements." October 12 Order at 3.

The plaintiffs in the instant cases seek judicial review of the four orders issued by the FERC mentioned above. In particular, Duke Energy Field Services, L.P. and El Paso Field Services, L.P. ("Duke") (Civil Action No. 01–1624) allege in their first amended complaint that "FERC does not have the statutory authority to promulgate the policing and enforcement regime created by Order Nos. 639 and 639–A." Amended Complaint at ¶ 9. Similarly, Williams Companies, Inc. and Dynegy Midstream Services, L.P. ("Williams") (Civil Action No. 01–1976) allege in their complaint that the orders are unlawful because the Commission failed to consult with certain federal officials prior to promulgating the new rules, as required by the OCSLA. Complaint at ¶ 19. Chevron U.S.A., Inc., et al. ("Chevron") (Civil Action No. 01–1580), on the other hand, allege in their first amended complaint that even if the FERC had the power to issue the regulations in the first instance, the agency "exceeded its statutory authority by failing to limit the application of the scope of the reporting requirements under Order Nos. 639 and 639–A to pipeline facilities performing transportation services under Sections 5(e) and (f) of the OCSLA." Amended Complaint at ¶ 23. In other words, Chevron contends that even if the FERC can promulgate these reporting regulations, the agency exceeded its statutory authority by doing so in such a broad manner as to include them within the scope of the regulations. All of the plaintiffs also allege that the FERC further exceeded its authority by issuing the Disclosure Order and the October 12 Order directing the release of the confidential information that they had filed with the agency. The plaintiffs seek both declaratory and injunctive relief from the Court.

---

8. The Court subsequently granted the plaintiffs' requests for a temporary restraining order ("TRO") against the FERC, thus preventing the agency from releasing this allegedly confidential information. In particular, the Court held a hearing on September 19, 2001, during which the plaintiffs and the FERC presented their positions on the issue. At the conclusion of the hearing, the Court found that the plaintiffs had satisfied the requirements for the issuance of a TRO. Furthermore, pursuant to a consent motion, the Court ordered that the information should not be released "until five business days after the issuance of an order denying a motion for preliminary injunction or an order granting a dispositive motion against a particular plaintiff." Order of September 26, 2001.

## II. JURISDICTION

Before reaching the merits of the plaintiffs' claims the Court must determine whether it has jurisdiction. These cases arise under the Administrative Procedure Act, 5 U.S.C §§ 701–701, and the OCSLA, 43 U.S.C. §§ 1331–1356. The Court has subject matter jurisdiction over the plaintiffs' claims pursuant to 28 U.S.C. § 1331 and 43 U.S.C § 1349. In its motions to dismiss, however, the FERC challenges the Court's jurisdiction on three grounds. First, the agency argues that none of the plaintiffs have standing to initiate these actions. Specifically, the agency states that the plaintiffs have failed to satisfy the injury-in-fact requirement of Article III and that their claims are thus not properly before the Court. Second, the FERC alleges that the Court does not have jurisdiction because the plaintiffs have failed to comply with the notice requirements of 43 U.S.C. § 1349. That statutory provision requires parties to provide the agency with notice of the alleged violation of the OCS-LA, in writing under oath, sixty days prior to filing suit. Third, the FERC argues that the consultation requirements of 43 U.S.C. § 1334(f)(3) do not create a private cause of action whereby private parties can sue the agency.[9] The Court will address each of these issues in turn.

### A. STANDING

■ In order to establish standing to sue under Article III of the Constitution, plaintiffs must demonstrate that: (1) they have suffered an injury-in-fact; (2) the injury is fairly traceable to the conduct of which they complain; and (3) the injury is likely to be redressed by a court decision in their favor. *Skaggs v. Carle*, 110 F.3d 831, 834 (D.C.Cir.1997) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351). For purposes of Article III, the injury "need

not be large or intense; an 'identifiable trifle,' the Supreme Court has said, is sufficient to meet the constitutional minimum." *Action Alliance of Senior Citizens v. Heckler*, 789 F.2d 931, 937 (D.C.Cir. 1986). The plaintiffs, however, have the burden of establishing each of these elements. *Id.* Moreover, "[s]ince they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 555, 112 S.Ct. 2130.

■ The Court finds that there are two reasons why the plaintiffs in the instant cases have satisfied the injury-in-fact requirement of Article III. First, the FERC has required the plaintiffs in these actions to comply with reporting regulations that obligate them to file with the agency quarterly reports containing information related to their contractual activities on the OCS. In particular, they must file a description and map of their facilities, a list of their affiliates, and their conditions of service (including the names of the shippers receiving service, the type of service provided, the primary receipt and delivery points, and the rates they charge each customer). The Court agrees with the plaintiffs that mandatory compliance with these regulations is sufficient to satisfy the constitutional requirement of injury-in-fact. *Association of American Railroads v. Dept. of Transportation*, 38 F.3d 582, 585–86 (D.C.Cir.1994) (stating that "there is undeniably a live, concrete 'case or controversy;' the [plaintiffs] allege that they are materially harmed by the additional regulatory burden imposed upon them as the result of a federal agency's unlawful

---

**9.** The FERC does not make this argument with respect to Chevron.

adoption of a rule, and seek to have that rule overturned. We hold under the circumstances that the [plaintiffs have] standing."). *See also NCAA v. Califano,* 622 F.2d 1382, 1389 (10th Cir.1980) (finding that "[c]ompulsion by unwanted and unlawful government edict is injury per se. Certainly the costs of obeying the regulations constitutes injury."). In reaching this conclusion, the Court notes that several other courts have similarly found an injury-in-fact where the plaintiffs are directly regulated by an administrative agency. *Wilcox Electric, Inc. v. FAA,* 119 F.3d 724, 728 (8th Cir.1997) (finding that plaintiffs that challenge a "regulation that applies directly to them, for example, will suffer the requisite injury simply because their activities are being limited."); *Asbestos Information Assoc. v. Reich,* 117 F.3d 891, 893 (5th Cir.1997) (finding the defendant's contention that the plaintiff has not suffered an injury-in-fact "meritless" since the plaintiff "challenges the regulation imposing hazard communication requirements directly on" it.); *American Forest and Paper Assoc. v. EPA,* 137 F.3d 291, 296 (5th Cir.1998) (noting that the plaintiffs' "imminent need to comply, coupled with EPA's frank announcement of its intentions, belies the agency's claim that any injury is speculative."). It is also important to note that the FERC has not cited, nor has the Court found, any cases to support its argument that a party regulated directly by an agency fails to suffer an injury-in-fact when required to comply with the agency's regulations.

Moreover, in addition to finding that the plaintiffs have suffered an injury as a result of having to comply with the regulations promulgated by the FERC, the Court specifically finds that requiring the plaintiffs to submit commercially sensitive information to the agency satisfies the injury-in-fact element of the standing doctrine. *Lutheran Church–Missouri Synod v. FCC,* 141 F.3d 344, 349 (D.C.Cir.1998) (noting that the "remedial reporting conditions, which require the [plaintiff] to keep extremely detailed employment records, further aggrieve the [plaintiff] by increasing an already significant regulatory burden."). *Cf. Truckers United For Safety v. Mead,* 251 F.3d 183, 188–89 (D.C.Cir.2001) (noting that "unlawful investigations and seizing" the plaintiffs' records "easily satisfy the injury/causation/redressability requirements of Article III of the Constitution.").[10] The plaintiffs clearly have an interest in keeping this information private, and requiring them to submit it to the FERC amounts to an "injury" for purposes of Article III. *Id.* This injury is compounded by the FERC's decision to release the information to the public in general and even potentially to the very companies the plaintiffs are competing against.[11] *Cf. FMC Corporation v. Boesky,* 852 F.2d 981, 989–90 (7th Cir.1988) (noting both that "misappropriation constitutes a distinct and palpable injury that is legally cognizable under Article III's case of controversy requirement," and that "[c]onfidential business information, even though intangible in nature, is corporate property[.]").

Second, the Court finds that the effect these regulations will have on the plaintiffs' competitive position in the OCS con-

---

10. The FERC argues that compliance with the regulations does not result in any judicially cognizable injury because it will cost at most $1600 per year. While that figure may or may not be accurate, the Court agrees with the plaintiffs that the "key point is that the orders under review promulgated regulations that specifically require Plaintiffs to comply with a complex series of regulatory requirements and to submit sensitive pricing data to the FERC." Duke's Opp'n. Brief at 4.

11. Duke has emphasized repeatedly during the course of this litigation that certain companies that they may be competing against are not subject to these reporting regulations.

stitutes an injury-in-fact for purposes of Article III. Courts "repeatedly have held that parties suffer constitutional injury in fact when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition." *Louisiana Energy and Power Authority v. FERC*, 141 F.3d 364, 367 (D.C.Cir.1998). *See also MD Pharmaceutical, Inc., v. DEA*, 133 F.3d 8, 11 (D.C.Cir.1998) (noting that the court has "previously held that 'increased competition represents a cognizable Article III injury.'"). In the instant case, the challenged regulations require the plaintiffs, but not all of their competitors, to submit commercially sensitive information to the FERC which the agency then plans to release to the public. In his affidavit, Professor Cason states that these asymmetric disclosure requirements will harm the disclosing firms by "reducing their ability and willingness to compete in the OCS and could ultimately eliminate these competitors from the OCS market." Aff. of Timothy Cason, at 3–4. In response, the FERC states that "an exempt service provider that is able to make use of the public record to enable it to add a new customer or entice one away from a competitor, will lose its reporting exemption by adding that shipper." FERC Dis. Br. At 9–10. The problem with the FERC's argument is that the applicable law simply does not support it. *Louisiana Energy and Power Authority*, 141 F.3d at 367; *MD Pharmaceutical, Inc.*, 133 F.3d at 11. In fact, the FERC failed to cite any case for the proposition that short-term competitive harm does not constitute an injury for purposes of Article III. Furthermore, even if all of the plaintiffs' competitors were required to comply with the reporting regulations, the plaintiffs would still suffer an injury by having their information collected by the FERC and released to the public. *Id.*

Additionally, it is worth noting that the FERC's assertion that the plaintiffs have not and will not suffer any injury as a result of the regulations appears to be inconsistent with the agency's position that the regulations will result in greater competition on the OCS. In Order No. 639, the FERC stated that the final rule, "by rendering offshore transactions transparent, should" result in "greater efficiencies in this marketplace." Order No. 639 at 31,-514. That is, the agency alleges that these reporting regulations will prevent anti-competitive practices—such as excessive pricing—by companies operating in the OCS. The agency further points out that the plaintiffs do not have any valid interest in charging exorbitant rates. The problem is that the plaintiffs would suffer an injury-in-fact if the FERC, through these or any other regulations, cause other companies to become more competitive with the plaintiffs' businesses. *MD Pharmaceutical, Inc.*, 133 F.3d at 11; *Tozzi v. HHS*, 271 F.3d 301, 307–10 (D.C.Cir.2001).

Having found that the plaintiffs have suffered an injury-in-fact for purposes of Article III, the Court has little trouble concluding that they have satisfied the second and third requirements of the doctrine. With respect to the "fairly traceable" requirement, the Court finds that the plaintiffs' injuries in the instant cases are clearly attributable to the four orders issued by the FERC. The plaintiffs had and still have to submit commercially sensitive information to the FERC precisely because of the orders at issue in these cases. Without these orders, the plaintiffs would not have had to file reports with the FERC and would not face having the information released to the public. Moreover, with respect to the redressability requirement, the Court similarly concludes that a favorable decision by the Court would alleviate those injuries because it would prevent the FERC from obtaining the commercially sensitive information in the future and would prevent the agency

from releasing the information that it has already collected.[12]

By arguing that the plaintiffs do not have standing to bring the instant claims, the FERC is essentially trying to avoid judicial review of its orders promulgating these regulations. As the Supreme Court has noted, "[t]he standing inquiry focuses on whether the plaintiff is the proper party to bring" the suit. *Raines v. Byrd*, 521 U.S. 811, 818, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997). Duke, Chevron, and Williams are all directly affected by these regulations by being required to submit commercially sensitive information to the FERC, having the information released to the public, and having their ability to compete impaired. It is hard for the Court to imagine any other parties more aggrieved by these orders. In fact, the Court thinks that it would be abdicating its responsibility under Article III if it were to conclude, as the FERC suggests, that it does not have jurisdiction to adjudicate the plaintiffs' claims because they lack standing.

### B. Sixty Day Notice Requirement

█ Next, the FERC argues that the Court does not have jurisdiction because the plaintiffs failed to comply with the OCSLA's notice requirements, which are found at 43 U.S.C. § 1349.[13] Specifically, the FERC contends that the plaintiffs did not submit their notices regarding the FERC's orders sixty days in advance of filing suit against the agency. The FERC argues that as a result the complaints challenging these orders must be dismissed. Because Williams is in a somewhat different procedural posture on this issue than Duke and Chevron, the Court will address their compliance with the notice requirement separately.

#### 1. Duke and Chevron

Section 1349(a)(2) of the OCSLA provides that "no action [alleging non-compliance with the statute] may be commenced ... prior to sixty days after the plaintiff has given notice of the alleged violation, in writing under oath, to the Secretary and any other appropriate Federal official, to the State in which the violation allegedly occurred or is occurring, and to any alleged violator." 43 U.S.C. § 1349(a)(2).[14] In accordance with this statutory provision, Duke and Chevron provided the appropriate officials, including individuals at

---

**12.** In addition to the constitutional requirements of Article III, "the Supreme Court has recognized prudential requirements for standing, including 'that a plaintiff's grievance must arguably fall within the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit.'" *Animal Legal Defense Fund v. Glickman*, 154 F.3d 426, 431 (D.C.Cir.1998) (citing *Bennett v. Spear*, 520 U.S. 154, 162, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997)). The Court concludes that the plaintiffs have satisfied this requirement since both the OCSLA and the APA provide for actions such as the instant matters. 43 U.S.C. § 1349; 5 U.S.C. § 706.

**13.** While the Supreme Court has expressly declined to determine whether such notice requirements are jurisdictional, the Court will address the issue in this section of the opin-

ion. *Hallstrom v. Tillamook County*, 493 U.S. 20, 30, 110 S.Ct. 304, 107 L.Ed.2d 237 (1989) (finding that "[i]n light of our literal interpretation of the statutory requirement, we need not determine whether [the notice requirement] is jurisdictional in the strict sense of the term."). The Court will do so because all of the parties treat it as such and since compliance with the notice provisions is clearly required before a party may file suit. *Id.* (noting that "[u]nder a literal reading of the statute, compliance with the 60–day notice provision is a mandatory, not optional, condition precedent for suit.").

**14.** It is important to note that the only basis upon which the FERC alleges the plaintiffs violated this provision relates to the sixty-day portion. That is, the agency does not challenge the substance of the notice or the "under oath" portion of the notice requirement.

the FERC, with notice of the agency's alleged violations of the OCSLA. Specifically, Duke submitted their notices regarding Order Nos. 639 and 639–A to the FERC on August 17, 2000[15] and September 1, 2000.[16] The notices of the alleged violations, which were actually contained in the requests for reconsideration of the orders, were placed under oath[17] and were quite detailed. *Cf. Public Interest Research Group v. Hercules, Inc.*, 50 F.3d 1239 (3d Cir.1995); *Water Keeper Alliance v. Dept. of Defense*, 271 F.3d 21 (1st Cir. 2001). Additionally, in terms of the timing of the notices, the Court has no problem finding that they were filed well more than sixty days before Duke instituted the instant action. Duke filed its complaint on July 27, 2001, and submitted an amended complaint on October 19, 2001, clearly more than sixty days after providing notice to the FERC. The same holds true for Chevron, which filed its notice on September 22, 2000,[18] its complaint on July 23, 2001, and its amended complaint on October 22, 2001.

In addition to filing notices regarding Order Nos. 639 and 639–A, Duke and Chevron both submitted additional notices concerning the Disclosure Order and the October 12 Order. Duke submitted its notices on October 17 and 18, 2001, and Chevron submitted its notice on October 19, 2001. The crux of the agency's posi-

tion appears to be that these plaintiffs did not provide notice regarding the Disclosure Order and the October 12 Order sixty days prior to filing their amended complaints. The Court finds the FERC's arguments on this issue utterly unpersuasive. Initially, the Court notes that to the extent it ultimately resolves both of these actions on grounds relating to Order Nos. 639 and 639–A, it does not appear to have been necessary for Duke or Chevron to provide the FERC with notice regarding the Disclosure Order and the October 12 Order. Even so, the Court finds that Duke and Chevron provided the agency with adequate notice regarding these orders.[19]

A plaintiff provides adequate notice under the OCSLA when its legal interests will be immediately affected by an agency's violation of the statute so long as the plaintiff gives the notice prior to filing the action. 43 U.S.C. § 1349(a)(3). Section 1349(a)(3) of the OCSLA explicitly provides that "[a]n action may be brought under this subsection immediately after notification of the alleged violation in any case in which the alleged violation ... would immediately affect a legal interest of the plaintiff." 43 U.S.C. § 1349(a)(3). In the instant case, the Disclosure Order of September 13, 2001, which was clarified in the October 12 Order, stated that the FERC would disclose the plaintiffs' com-

---

**15.** Duke provided this notice.

**16.** El Paso submitted this notice.

**17.** The Court finds that this is sufficient to satisfy the "under oath" requirement because the notice of the alleged violation literally was placed under oath.

**18.** Chevron provided notice of the alleged violation of the OCSLA in a letter that was placed under oath. The Court concludes that this satisfies the under oath requirement of § 1349.

**19.** The Court also finds it important to note that the agency does not demonstrate how filing the additional notices or the amended complaints erased the efficacy of the prior notices. The initial notices provided the FERC with knowledge that Order Nos. 639 and 639–A violated the OCSLA, and the subsequent notices and the amended complaints in no way altered this awareness. Accordingly, at best the Court should only reach the merits of the plaintiffs' claims regarding those orders. Indeed, the FERC itself states that "separate causes of action in a single complaint are independent of each other." Reply (Chevron) at 7.

mercially sensitive information within five days. The Court finds that release of such information certainly would detrimentally affect the plaintiffs' legal interest in preserving the confidentiality of the information and in maintaining its suits challenging Order Nos. 639 and 639–A. *Honeywell, Inc. v. Consumer Product Safety Comm'n,* 582 F.Supp. 1072 (D.D.C.1984); *Metropolitan Life Ins. Co. v. W.J. Usery,* 426 F.Supp. 150 (D.D.C.1976). Moreover, the Court finds that the alleged violation would immediately affect these legal interests of the plaintiffs. In particular, the plaintiffs allege that the FERC violated the OCSLA by ordering the release of commercially sensitive information that it should not have been able to collect in the first place. In the Disclosure Order, the FERC explicitly stated that "five days from the date of issuance of this order, we will place information contained in OCSLA reports in public files." Disclosure Order at 10. Given the release time set by the FERC, the plaintiffs' legal interests would be affected in such a short period of time that they properly invoked 43 U.S.C. § 1349(a)(3). In sum, the FERC's argument that the plaintiffs were required to wait sixty days before challenging orders that would have released their commercially sensitive information in five days is simply nonsensical and must be rejected.[20]

### 2. *Williams*

Williams' situation is distinguishable from that of Duke and Chevron because Williams did not provide satisfactory notice regarding Order Nos. 639 and 639–A to the FERC more than sixty days prior to

filing suit against the agency. Rather, Williams submitted its notice to the FERC and the other appropriate agencies on September 17, 2001. In its notice, Williams explicitly stated, however, that "this letter constitutes notice under section 23(a) of the [OCSLA], 43 U.S.C. § 1349(a)(3)[.]" That is, Williams recognized that it did not comply with the sixty day notice requirement of section (a)(2), but argued that it did not have to because of the FERC's Disclosure Order and October 12 Order. In accordance with the Court's findings above regarding Duke and Chevron, the Court agrees that Williams could submit its notice pursuant to § 1349(a)(3) regarding the Disclosure Order of September 13, 2001 and the October 12 Order. Moreover, to the extent Williams can challenge those two orders, the Court finds that as a threshold matter it must evaluate the propriety of Order Nos. 639 and 639–A. That is, before determining whether the FERC validly exercised its authority by ordering the commercially sensitive information collected as a result of the reporting regulations released to the public, the Court must determine whether the agency exceeded its authority by requiring Williams to file the information in the first place. In reaching this conclusion, the Court notes that the FERC has recognized that the Disclosure Order cannot be viewed in a vacuum. Rather, in the Disclosure Order itself, the FERC stated that "[w]hile this request [for disclosure] could be processed through the Commission's FOIA regulations, we have decided to address this issue in the instant order because the Producer Coalition's request involves a critical element of Order Nos. 639 and 639–A." [21]

---

**20.** Indeed, this appears to be a prime example of why Congress included § 1349(a)(3) in the OCSLA. In the context of the notice provisions in environmental statutes, the First Circuit has noted that "the notice provision provides agencies with an opportunity to resolve the dispute and take any necessary corrective measures before a resort to the courts." *Wa-*

*ter Keeper Alliance,* 271 F.3d at 29. In the instant case, there simply was not enough time based on the language of the orders for Duke or Chevron to wait sixty days prior to filing suit against the FERC.

**21.** The Court makes this finding despite the FERC's footnote 17 that states "[t]his decision

As a result of this conclusion, the Court does not need to decide whether Williams can directly challenge Order Nos. 639 and 639–A.

### C. The Consultation Procedures of the OCSLA

Finally, the FERC argues that the Court does not have jurisdiction over the plaintiffs' claims because the consultation requirement of the OCSLA, 43 U.S.C. § 1334(f)(3), fails to create a private cause of action. Even assuming that the FERC's assertion that the consultation requirement does not establish a private cause of action is correct, the Court concludes that it has jurisdiction over the plaintiffs' claims against the agency. First, with respect to Chevron, the FERC does not allege that its causes of action are based on the agency's compliance with the consultation requirements of § 1334(f)(3). As such, the Court has no trouble finding that it has jurisdiction, in this regard, over Chevron's claims against the agency.

Second, with respect to Duke, the Court finds that its claims against the FERC are also not dependent on the agency's compliance or lack of compliance with § 1334(f)(3). Rather, Duke alleges in its amended complaint that the FERC violated the OCSLA because the agency "does not have the statutory authority to promulgate the policing and enforcement regime created by Order Nos. 639 and 639–A." Amended Complaint at ¶ 32. Duke further alleges that "[t]he FERC has authority only to issue construction certificates to OCS pipelines that are 'transmission lines' and are, therefore, subject to its jurisdiction under the Natural Gas Act. However, because the Order Nos. 639 and

639–A subject [p]laintiffs' exempt natural gas gathering activities to policing and enforcement actions by the FERC, they exceed the scope of the Commission's jurisdiction and are unlawful." Amended Complaint at ¶ 38. The fact that Duke mentions the consultation requirement in paragraph 40 of its amended complaint is inconsequential because it does not represent the basis upon which Duke alleges the agency violated the OCSLA. That is, Duke does not base its claims against the FERC on the agency's compliance with § 1334(f)(3).

Third, with respect to Williams, the Court finds that it has jurisdiction since the companies' complaint, and specifically Count II, is not dependent on the FERC's compliance with the consultation provision of the OCSLA. In paragraph one of its complaint, Williams alleges that the orders are "beyond the scope of the Commission's delegated authority under the OCSLA, and were promulgated without observing procedures required by law." Complaint at ¶ 1. Furthermore, Williams alleges in paragraph 15 that the FERC's "new rules are inconsistent with the pro-competitive objectives and regulatory structure of the OCSLA, and are beyond the Commission's authority thereunder." Complaint at ¶ 15. These allegations are in addition to paragraph 14, where Williams does mention the FERC's failure to consult with the Attorney General prior to issuing the orders.[22] Moreover, in Count II, Williams specifically alleges that the orders are "unlawful within the meaning of 5 U.S.C. § 706 in that ... the orders exceed the Commission's statutory jurisdiction, authority, or limitation[.]" Complaint at ¶¶ 20–21.

---

is not contingent on any potential or pending judicial review of our final rule." Order No. 639 at 62,098.

**22.** This allegation is not made in reference to the FERC's Disclosure Order or the October

12 Order, which are being challenged by Williams. The Court finds that Williams' challenge to those orders does not depend on the FERC's compliance with the consultation requirement of the OCSLA.

## III. ANALYSIS

As indicated above, before addressing whether the FERC exceeded its authority by ordering the release of the commercially sensitive information submitted by the plaintiffs, the Court must first determine, as a threshold matter, whether the agency had the power to require production of the information in the first place. Specifically, the Court will begin its analysis by evaluating whether the OSCLA authorized the FERC to promulgate the reporting regulations.[23]

### A. Standard For Summary Judgment

Federal Rule of Civil Procedure 56 provides that a court shall grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In the instant cases, the parties all contend that there is no genuine issue of material fact. That is, the plaintiffs and the defendants submit that the issues before the Court are exclusively questions of law. The Court agrees and will proceed accordingly.[24]

**23.** It is important to note that this threshold inquiry applies with equal, if not greater, force to Chevron's claims against the FERC. This is because before the Court determines whether the FERC's regulations were overly broad as to include companies such as Chevron, it must first determine whether the agency had the power to promulgate the regulations at all.

**24.** As noted above, the Intervenor–Defendants entitled their motion as one to dismiss or alternatively, for summary judgment. There is no substantive difference between the two for purposes of the instant matters. *American Bioscience, Inc., v. Thompson*, 269 F.3d 1077, 1083 (D.C.Cir.2001) (noting that "in agency review context there was no real distinction between questions presented in Rule 12(b)(6) motion to dismiss and motion for summary judgment.").

### B. Reviewing the FERC's Orders issued pursuant to the OCSLA

■ The Court will analyze the FERC's interpretation of the OCSLA in accordance with the familiar two-part test established in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).[25] *Grand Canyon Air Tour Coalition v. FAA*, 154 F.3d 455, 466 (D.C.Cir. 1998) (noting that *Chevron* "governs our analysis of the validity of an agency's interpretation of a statute."). Under *Chevron*, the Court must first consider whether Congress "has directly spoken to the precise question at issue, for if it has, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *NRA v. Reno*, 216 F.3d 122, 127 (D.C.Cir.2000); *Appalachian Power Co. v. EPA*, 135 F.3d 791, 800 (D.C.Cir.1998). In making this determination, courts must exhaust the traditional tools of statutory construction, including looking at the statute's text, structure, and legislative history. *Arizona Public Service Co. v. EPA*, 211 F.3d 1280, 1287 (D.C.Cir.2000).

**25.** Interestingly enough, Chevron argues in its motion for summary judgment that the Court should not afford the FERC any deference in interpreting the OCSLA because "[a]bsent a clear congressional delegation of authority to the particular agency at issue, however, *Chevron* deference is not appropriate even if the statute is ambiguous." Motion for S.J. at 11–12 (citing cases such as *Salleh v. Christopher*, 85 F.3d 689 (D.C.Cir.1996), and *Rapaport v. Dept. of the Treasury*, 59 F.3d 212 (D.C.Cir. 1995)). The Court finds that as a result of its findings below, it does not need to resolve this issue. As the D.C. Circuit recently stated, the court "need not determine whether an agency's interpretation of a statute . . . is subject to *Chevron* analysis in order to decide this case, as the agency's determination here cannot be upheld with or without deference." *Commonwealth of Massachusetts v. Dept. of Transportation*, 93 F.3d 890, 892 (D.C.Cir.1996).

If, after utilizing these tools of statutory construction, the Court determines that congressional intent is ambiguous, the Court must move to the second step of the *Chevron* analysis. *Id.* Under this step, the Court will defer to the agency's interpretation of the statute so long as it is based on a permissible reading. *Grand Canyon Air,* 154 F.3d at 466. In particular, to satisfy this prong of the *Chevron* test, the agency only needs to establish that its construction is reasonable and consistent with the statute's purpose and legislative history. *GTE Service Corp. v. FCC,* 205 F.3d 416, 421 (D.C.Cir.2000); *Independent Insurance Agents of America v. Hawke,* 211 F.3d 638, 643 (D.C.Cir.2000); *Bell Atlantic Telephone Co. v. FCC,* 131 F.3d 1044, 1049 (D.C.Cir.1997). It is important to note that "step two of *Chevron* requires [the court] to evaluate the same data that [it] also evaluate[d] under *Chevron* step one, but using different criteria. Under step one [the court] consider[s] text, history, and purpose to determine whether these convey a plain meaning that *requires* a certain interpretation; under step two [the court] consider[s] text, history, and purpose to determine whether these *permit* the interpretation chosen by the agency." *Bell Atlantic Telephone Co.,* 131 F.3d at 1049.

### 1. *Chevron Step One*

#### a) *Text*

The Court's inquiry begins, as it must, with the text of the OCSLA. *Duncan v. Walker,* 533 U.S. 167, 121 S.Ct. 2120, 2124, 150 L.Ed.2d 251 (2001); *Southern California Edison Co. v. FERC,* 116 F.3d 507, 511 (D.C.Cir.1997); *Natural Resources Defense Council v. Browner,* 57 F.3d 1122, 1125 (D.C.Cir.1995). At the outset, however, it is important to note that the FERC did not specify in its orders which particular provision or provisions of the OCSLA grant it the authority to promulgate the reporting regulations at issue in these cases. In Order No. 639, the FERC cites the entire OCSLA as the basis for its authority to ensure that natural gas is transported on an open and nondiscriminatory basis through pipeline facilities located on the OCS. Order No. 639 at 31,514. Moreover, in Order No. 639–A, the FERC stated that its new "rule is predicated entirely upon the OCSLA's open and nondiscriminatory access requirements." Order No. 639–A at 31,675. In its motion for summary judgment, the FERC does specifically refer to 43 U.S.C. § 1334(f)(1)(A) as granting the agency power to promulgate these reporting regulations. Accordingly, while the Court will consider other provisions of the OCSLA in determining whether the FERC acted within its authority by issuing these orders, it will primarily focus on § 1334(f)(1)(A).

#### (1) *Section 1334(e)-Pipeline rights-of-way; forfeiture of grant.*

■ Section 1334(e), which deals with rights-of-way through the submerged lands of the OCS, grants FERC the authority to determine, in consultation with the Secretary of Energy, "proportionate amounts" of oil and gas production to be transported or purchased by pipelines. Specifically, the provision provides that:

> Rights-of-way through the submerged lands of the outer Continental Shelf, whether or not such lands are included in a lease maintained or issued pursuant to this Act, may be granted by the Secretary for pipeline purposes for the transportation of oil, natural gas, sulphur, or other minerals, or under such regulations and upon such conditions as may be prescribed by the Secretary, or where appropriate the Secretary of Transportation, including (as provided in section 21(b) of this Act [43 U.S.C. § 1347(b) ] ) assuring maximum environmental protection by utilization of the

best available and safest technologies, including the safest practices for pipeline burial and upon the express condition that oil or gas pipelines shall transport or purchase without discrimination, oil or natural gas produced from submerged lands or outer Continental Shelf lands in the vicinity of the pipelines in such proportionate amounts as the Federal Energy Regulatory Commission, in consultation with the Secretary of Energy, may, after a full hearing with due notice thereof to the interested parties, determine to be reasonable, taking into account, among other things, conservation and the prevention of waste. Failure to comply with the provisions of this section or the regulations and conditions prescribed under this section shall be ground for forfeiture of the grant in an appropriate judicial proceeding[.]

43 U.S.C. § 1334(e). Based on the arguments presented by the FERC in Order Nos. 639 and 639–A, its motion for summary judgment, and its opposition to the plaintiffs' motions for summary judgment, it does not appear that the agency is relying on this section as the basis for its power to promulgate the reporting regulations. Nevertheless, after a careful review of this section, the Court finds that it does not grant FERC the rule-making power it exercised in Order Nos. 639 and 639–A. The language of this statutory provision is clear with regard to the FERC. The provision authorizes the agency, in the context of right-of-ways, to determine "proportionate amounts" of oil or natural gas produced from submerged lands or OCS lands to be transported or purchased. Moreover, the statute explicitly states that the FERC should do so in the confines of adjudications. In the orders at issue in these actions, the FERC did not make any decision regarding amounts of gas or oil to be transported or purchased and certainly did not do so in an adjudicative setting. Rather, the agency promulgated OCS-wide regulations that require the plaintiffs to submit commercially sensitive information to ensure that they are not acting in an anti-competitive manner. There is absolutely no way to construe this clear statutory provision as granting the FERC the ability to promulgate such reporting regulations.

(2) *Section 1334(f)-Competitive principles governing pipeline operation.*

■ 43 U.S.C. § 1334(f) appears to be the only other provision of the OCSLA upon which the FERC could rely as authority for its issuance of Order Nos. 639 and 639–A. The Court will begin its analysis of this provision by reviewing subsection 1334(f)(1)(A). That subsection provides:

(1) Except as provided in paragraph (2), every permit, license, easement, right-of-way, or other grant of authority for the transportation by pipeline on or across the outer Continental Shelf of oil or gas shall require that the pipeline be operated in accordance with the following competitive principles:

(A) The pipeline must provide open and nondiscriminatory access to both owner and nonowner shippers.

43 U.S.C. § 1334(f)(1)(A). The Court finds that the language of this statutory provision is void of any ambiguity; that is, the Court finds the text of the statute to be clear. The subsection provides that whenever an agency issues a permit, license, easement, right-of-way, or other grant of authority for the transportation by pipeline on or across the OCS of oil or gas to a party, the agency must require the party to operate the pipeline in accordance with the competitive principle articulated in paragraph (A). The subsection thus acts as a limitation on the manner in which an agency issues such permits, licenses, easements, rights-of-way, or other grants, rather than providing the agency with addi-

tional authority to promulgate regulations. Moreover, the Court finds that the inclusion of paragraph (A) in this subsection is also clear. This portion of subsection 1334(f)(1) articulates a competitive principle with which the party receiving the grant of authority from the agency must comply. Specifically, the party operating the pipeline must provide open and nondiscriminatory access to both owner and nonowner shippers. In creating this requirement, subsection 1334(f)(1)(A) does not mention the FERC at all nor does it purport to grant the agency rulemaking power. Rather, the paragraph specifies one such competitive principle that must be included in every permit, license, easement, right-of-way, or other grant of authority for the transportation by pipeline on or across the OCS of oil or gas. As such, the Court finds that the plain language of 43 U.S.C. § 1334(f)(1)(A) does not provide the FERC with the authority to promulgate the reporting regulations at issue in this case.

■ Next, the Court will consider whether subsection 1334(f)(1)(B) provides the FERC with the power to issue Order Nos. 639 and 639–A. Subsection 1334(f)(1)(B) provides that:

(B) Upon the specific request of one or more owner or nonowner shippers able to provide a guaranteed level of throughput, and on the condition that the shipper or shippers requesting such expansion shall be responsible for bearing their proportionate share of the costs and risks related thereto, the Federal Energy Regulatory Commission may, upon finding, after a full hearing with due notice thereof to the interested parties, that such expansion is within technological limits and interested parties, that such expansion is within technological limits and economic feasibility, order a subsequent expansion of throughput capacity of any pipeline for which the permit, license, easement,

right-of-way or other grant of authority is approved or issued after the date of enactment of this subparagraph. This subparagraph shall not apply to any such grant of authority approved or issued for the Gulf of Mexico or the Santa Barbara Channel.

43 U.S.C. § 1334(f)(1)(B). This subsection thus grants the FERC the power—after an adjudicative hearing—to order an expansion of a pipeline in OCS areas, other than the Gulf of Mexico and the Santa Barbara Channel, upon the specific request of a shipper. The clear language of this subsection belies any assertion by the FERC that it grants the agency with the power to promulgate these reporting regulations.

■ The Court will now determine whether § 1334(f)(2) authorizes the FERC to issue the orders at issue in these cases. Section 1334(f)(2) provides that:

[t]he Federal Energy Regulatory Commission may, by order or regulation, exempt from any or all of the requirements of paragraph (1) of this subsection any pipeline or class of pipelines which feeds into a facility where oil and gas are first collected or a facility where oil and gas are first separated, dehydrated, or otherwise processed.

43 U.S.C. § 1334(f)(2). The Court finds that this provision is also clear for purposes of *Chevron* step one analysis. This is the OCSLA's first, and apparently only, grant of regulation making authority to the FERC. That power, however, is expressly limited to determining which lines will be exempt from the OCSLA's requirements in paragraph 1334(f)(1) as being feeder lines. By its language, the statutory provision does not grant the FERC the power to promulgate reporting regulations such as the ones at issue in these cases. Thus, the Court agrees with the plaintiffs that the FERC cannot bootstrap this limited

grant of regulation making authority into the power to issue Order Nos. 639 and 639–A. As Duke stated in its motion for summary judgment, "[i]t is a non-sequitur to argue that, by allowing the FERC to carve out feeder lines from the 'non-discriminatory access' provision of the OCSLA, Congress must have somewhere provided the FERC with authority to regulate competition across the entire OCS market." Duke Mot. for S.J. at 18.

■ The final provision of the OCSLA that the FERC could rely upon for authority to promulgate the reporting regulations at issue in these cases is found in section 1334(f)(3). That section provides that:

[t]he Secretary of Energy and the Federal Energy Regulatory Commission shall consult with and give due consideration to the views of the Attorney General on specific conditions to be included in any permit, license, easement, right-of-way, or grant of authority in order to ensure that pipelines are operated in accordance with the competitive principles set forth in paragraph (1) of this subsection. In preparing any such views, the Attorney General shall consult with the Federal Trade Commission.

43 U.S.C. § 1334(f)(3). Initially, the Court notes that the FERC has apparently disavowed any reliance on this provision as the basis for its authority to issue Order Nos. 639 and 639–A.[26] Order 639–A at 31,675 (noting that the "final rule's reporting requirements are not such a condition

...[and as] such we conclude consultation with the Attorney General is not a prerequisite for promulgating this reporting rule."). Even so, the Court finds that this provision clearly does not provide the FERC with the power to issue the regulations contested in these cases. Rather, the provision requires that prior to including any specific conditions in a permit, license, easement, right-of-way, or grant of authority in order to ensure that the pipelines operate in accordance with the competitive principles of paragraph (1), the agency should consult with the Attorney General. This provision by its express terms simply does not provide the FERC with any additional regulatory authority.

*b) Shell Oil Company v. FERC*

Despite the FERC's protestations to the contrary, the Court finds that the D.C. Circuit's decision in *Shell Oil Company v. FERC*, 47 F.3d 1186 (D.C.Cir.1995), does not recognize the agency's authority under the OCSLA to promulgate the reporting regulations at issue in these cases. The petitioners in *Shell* challenged an order by the FERC concerning access to the Bonito pipeline system on the OCS. 47 F.3d at 1189. In particular, Pennzoil, which was one of the owners of the Bonito pipeline, petitioned the FERC for a declaratory order that the pipeline did not have to transport crude oil from Shell Oil Company's Auger Unit production facility, and that it specifically did not have to interconnect with Shell. *Id.* at 1190. The FERC, ap-

**26.** The Court is perplexed by the Producer Coalitions' contention that this statutory provision grants the FERC the power to promulgate the reporting regulations at issue in the instant cases. First, as noted above, the agency itself did not rely on this provision as the basis for its power to promulgate the reporting regulations and in fact attempted to distance itself from it. Second, even if the Court agreed with the Producer Coalition that by inference the paragraph granted some power

to the FERC, the agency cannot make that power any broader than the language of the provision provides. The paragraph explicitly refers to "specific conditions to be included in any permit, license, easement, right-of-way, or grant of authority[.]" The action taken by the FERC in Order Nos. 639 and 639–A clearly diverges from what is stated in § 1334(f)(3). Consequently, the Court must reject the Producer Coalition's argument in this regard.

plying the "open and nondiscriminatory access" provision of the OCSLA, concluded that refusing Shell's request to transport its oil constituted discrimination under the Act, and accordingly required the Bonito pipeline to transport Shell's crude oil from its Auger Unit production facility. *Id.* at 1196. On appeal, the D.C. Circuit sustained the FERC's decision because it found no basis on which to conclude that the Order was contrary to the express provisions of the OCSLA. *Id.* at 1197. The court further stated, in the context of Pennzoil's claim that the agency exceeded its authority by mandating the interconnection, that it "accept[ed] the Commission's determination that it had the authority to order an interconnection with an existing pipeline with excess capacity where the interconnection [wa]s necessary to the Commission's enforcement of the open access requirements of the OCSLA." *Id.* at 1200 (also stating that the FERC "administers and enforces the relevant provisions of the OCSLA[.]").

The Court finds that Order Nos. 639 and 639–A are readily distinguishable from the order at issue in *Shell.* In contrast to the situation in *Shell,* the FERC in the present cases has not ruled, in the context of an adjudicative proceeding, whether certain conduct violates the open access provision of the OCSLA. Rather, these plaintiffs allege that the FERC violated the OCSLA itself by promulgating OCS-wide reporting regulations that require them to submit sensitive commercial information to the agency. Moreover, the FERC's action specifically sustained in *Shell* (and referred to by the FERC in its motion for summary judgment) concerned the agency's decision to order an interconnection as the remedy for the violation of the open access provision. The court found this remedy permissible since it was necessary to compel compliance with the open access provision of the statute. To be sure, the court specifically cited *ICC v.*

*American Trucking Associations, Inc.,* 467 U.S. 354, 367, 104 S.Ct. 2458, 81 L.Ed.2d 282 (1984), for the proposition that an "agency's discretion to fashion remedies is legitimate provided it furthers the statutory mandate and is closely tied to that mandate." *Id.* In *American Trucking* Justice Marshall, writing for the Court, stated that the "sole concern in this case" is whether "fashioning this remedy falls within the Commission's authority to modify express remedies in order to achieve legitimate statutory purposes." *American Trucking,* 467 U.S. at 360, 367, 104 S.Ct. 2458 (further stating that "[t]o lie within the Commission's discretionary power, the proposed remedy must satisfy two criteria: first the power must further a specific statutory mandate of the Commission, and second, the exercise of power must be directly and closely tied to that mandate."); *See also Laclede Gas Co. v. FERC,* 997 F.2d 936, 944 (D.C.Cir.1993) (noting, in the context of the NGA, that "FERC enjoys a great deal of flexibility in the remedy phase of an enforcement proceeding. Indeed, as we have often noted, FERC's discretion is at its zenith when the action assailed relates primarily to the fashioning of remedies and sanctions."). In the instant cases, on the other hand, the FERC did not make any determination that Duke, Chevron, or Williams violated the relevant provision of the OCSLA or find, that as a remedy for such a violation, they must submit these reports. Indeed, the FERC explicitly stated in its opposition to the plaintiffs' motions for summary judgment that "[t]he regulations require reporting, rather than remedies for alleged discrimination[.]" FERC's Opposition at 17. The fact that the agency finds these reporting regulations necessary does not mean that the agency has been granted the statutory authority to promulgate them or that *Shell* supports the notion that the agency has the power

to do so. *Sea Robin Pipeline Co. v. FERC*, 127 F.3d 365, 371 (5th Cir.1997) (noting that "[n]eed for regulation cannot alone create authority to regulate.").

 In sum, the Court finds that the clear, unambiguous text of the OCSLA does not provide the FERC with the power to promulgate the regulations at issue in these cases.[27] Moreover, since it is axiomatic that agencies cannot promulgate regulations unless they are delegated the power to do so by Congress, the Court finds that the FERC cannot adopt these reporting regulations.[28] *Louisiana Public Service Commission v. FCC*, 476 U.S. 355, 374, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986) (recognizing that "an agency literally has no power to act ... unless and until Congress confers power upon it."); *Michigan v. EPA*, 268 F.3d 1075, 1082 (D.C.Cir.2001) (stating that "[a]gency authority may not be lightly presumed. Were courts to presume a delegation of power absent an express withholding of such power, agencies would enjoy virtually limitless hegemony, a result plainly out of keeping with *Chevron* and quite likely with the Constitution as well."); *Ethyl Corp. v. EPA*, 51 F.3d 1053, 1060 (D.C.Cir.1995) (refusing, "once again to presume a delegation of power merely because Congress has not expressly withheld such power."); *Friends of Crystal River v. EPA*, 35 F.3d 1073, 1080 (6th Cir.1994) (noting that "[a]gencies are creatures of statutory authority. Thus, they

have no power to act ... unless and until Congress confers power upon them."); *Ball, Ball, Brosamer, Inc., v. Reich*, 24 F.3d 1447, 1450 (D.C.Cir.1994) (finding that an "agency can neither adopt regulations contrary to statute, nor exercise powers not delegated to it by Congress."); *HCA Health Services v. Shalala*, 27 F.3d 614, 618 (D.C.Cir.1994) (noting the "axiom[ ] that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress."). Thus, the Court began its analysis in this section with the text of the OCSLA and, based on its conclusions, it will end there as well. *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999) (finding that the court's inquiry under step one ends with the text where the statutory language provides a clear answer to the contested issue); *United States v. Lin*, 101 F.3d 760, 765–66 (D.C.Cir.1996) (noting that "it is elementary in the law of statutory construction that, absent ambiguity or unreasonable result, the literal language of the statute controls and resort to legislative history is not only unnecessary but improper."). *See also American Petroleum Institute v. EPA*, 52 F.3d 1113, 1120 (D.C.Cir.1995) ("To suggest, however, that *Chevron* step two is implicated any time a statute does not expressly *negate* the existence of a claimed administrative power (i.e. when the statute is not written in thou

**27.** It is important to note that, based on the foregoing analysis, the Court finds that the D.C. Circuit's decision in *Shell* does not create uncertainty regarding the plain meaning of the statute's text with respect to the issues presented in these cases.

**28.** There are two additional points worth making. First, the FERC provides virtually no textual argument in support of its contention that the OCSLA grants the agency power to promulgate these regulations. Rather, the agency seems to rely almost exclusively on the statute's legislative history and

the D.C. Circuit's decision in *Shell Oil v. FERC*, 47 F.3d 1186. While it is certainly permissible to place some reliance on such authorities, the agency should also have provided some analysis on where the statute itself grants the agency the power to promulgate these regulations. Second, throughout the OCSLA Congress specified when it was granting a particular agency, including the FERC, rulemaking or adjudicative power. In these sections of the OCSLA discussed above, Congress simply did not provide the FERC with the power to promulgate reporting regulations.

shalt not' terms), is both flatly unfaithful to the principles of administrative law ..., and refuted by precedent."). Nevertheless, in order to provide a complete review of the FERC's position in these matters, the Court will briefly apply step two of the *Chevron* test.

### 2. *Chevron Step Two*

■ There are two reasons why even if the Court assumed that the OCSLA was silent on the extent of the FERC's power under the statute and that the FERC was delegated the power to enforce section 1334(f), it would nevertheless reject the agency's interpretation of the Act. At the outset, it is important to note that the FERC is essentially claiming a wholesale delegation of power concerning the open and nondiscriminatory access provision of the OCSLA. Specifically, in its opposition to the plaintiffs' motions for summary judgment, the agency asserts that it "has the authority *in addition* to those specified in the subsection [§ 5(f) ] to take whatever action is necessary to enforce pipeline adherence to the § 5(f)(1)(A) open access mandate." FERC's Opp'n at 5. Indeed, under this interpretation the only apparent limitation would be that the action taken was, in the FERC's view, necessary to enforce section 1334(f)(1)(A).[29] Moreover, despite the agency's bold assertion of regulatory power, the Court recognizes that pursuant to the second step of *Chevron* it should defer to the FERC's interpretation of the OCSLA provided that it is reasonable and consistent with the statutory purpose and legislative history. *Bell Atlantic*, 131 F.3d at 1049; *Hawke*, 211 F.3d at 643. Nevertheless, even under this deferential standard, the Court concludes that the FERC's construction of the OCSLA (and § 1334(f) in particular) is not reasonable and therefore, must be rejected.

The first reason why the Court rejects the FERC's interpretation of the OCSLA is that it "diverges from any realistic meaning of the statute." *GTE Service Corp. v. FCC*, 205 F.3d 416, 421 (D.C.Cir. 2000); *Bell Atlantic*, 131 F.3d at 1049 (noting that courts "will not uphold an interpretation that diverges from any realistic meaning of the statute."). In support of its interpretation of the statute, the FERC argues that absent the authority to promulgate the reporting regulations the agency would be unable to determine whether non-NGA pipelines were discriminating on the OCS.[30] Thus, the agency asserts that these regulations are necessary in order to ensure that the open access provision of section 1334(f) is followed. The problem with the FERC's solution to this regulatory gap problem is that the "[n]eed for regulation cannot alone create authority to regulate." *Sea Robin Pipeline Co.*, 127 F.3d at 371. The Supreme Court has explicitly stated that "no legislation pursues its purposes at all costs. Deciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice—and it frustrates rather than effectuates legislative

---

**29.** Under the APA, however, this restriction certainly would be limited since courts would review the agency's "necessary" action under the arbitrary and capricious standard.

**30.** In this regard, it is worth noting that other statutes, such as the NGA, explicitly provide that companies submit pricing information to the appropriate administrative agency. *Public Utilities Commission of California v. FERC*, 236 F.3d 708, 711 (D.C.Cir.2001) (stat-

ing that section 4 of the NGA " requires natural gas companies to file all rates and contracts with FERC."). *See also Maislin Indus. v. Primary Steel*, 497 U.S. 116, 119–20, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990) (recognizing that the Interstate Commerce Act "requires a motor common carrier to 'publish and file with the Commission tariffs containing the rates for transportation it may provide.' "). The OCSLA does not have such a requirement.

intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law." *Pension Benefit Guaranty Corp. v. LTV Corp.,* 496 U.S. 633, 646–47, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990). In the instant case, the Court finds it unreasonable to read the OCSLA as granting the FERC, which is not even mentioned in § 1334(f)(1)(A), the power to do whatever it concludes is necessary to effectuate the open access provision. In reaching this conclusion the Court notes that the FERC does not rely on the text of the OCSLA in any meaningful way to support its assertion of regulatory power. Rather, the agency relies on what is not provided in the statute. That is, the FERC contends that since § 1334(f)(1)(A) places no limitation on its ability to enforce the provision, the provision therefore implies that the agency can do whatever it finds necessary to do so. Accepting such a construction of this statute would turn administrative law and statutory construction on its head. Instead of looking for a grant of authority in the statute as the basis for its power, agencies would be looking for statutory provisions that withdraw authority from the agency to determine what it can and cannot do.[31] The FERC's interpretation of the OCSLA is therefore unreasonable. This finding is also reinforced by the maxim that "an agency literally has no power to act ... unless and until Congress confers power upon it." *Louisiana Public Service Commission,* 476 U.S. at 374, 106 S.Ct. 1890. The FERC would have the Court believe that it possesses power under the OCSLA based on the fact that the statute does not explicitly circumscribe what the agency is doing in these particular cases. The applicable law simply does not support such a proposition.

The second reason why the Court rejects the FERC's interpretation of the OCSLA is that it is not supported by the legislative history. As the FERC notes, during the debate on the amendment that later became subsection § 1334(f), Senator Kennedy, who first offered the amendment, stated that the Secretary of the Interior would place the open access conditions in the leasing arrangements and then the ICC would enforce them. 123 Cong. Rec. at S23253 ("what I would see happening is that this would be boilerplate language in the leasing arrangements and that ... the enforcement of that could be done by the ICC. Basically, all that we are trying to insure is that in the right-of-way grants, these provisions be included.")[32] These remarks, like the text of the OCSLA itself, indicate that the FERC does not have the power to promulgate regulations under the open access provision of section 1334(f). Rather, the FERC would only have the power to compel compliance with the open access conditions instituted by the Secretary of the Interior, something the agency is not doing in Order Nos. 639 and 639–A. Put another way, these remarks indicate that while Congress intended to give the ICC [now FERC] a role in enforcing the open access provision of the OCSLA, it did not give the agency carte blanche authority to do so. Such extensive authority, however, is exactly what the agency has taken under its interpretation of § 1334(f)(1)(A). Accordingly, the Court rejects that interpretation.

## IV. CONCLUSION

For the foregoing reasons, the Court finds that the FERC exceeded its authority by promulgating the reporting regulations at issue in these cases. Moreover, to

---

**31.** This analysis applies with equal force to the Producer Coalition's interpretation of the OCSLA.

**32.** As noted above, the FERC subsequently took over the ICC's responsibilities in this area.

the extent the Court finds that the FERC did not have the power to promulgate the regulations in the first instance, it also concludes that the agency should not release the information collected under these regulations. As such, the Court holds that, as a matter of law, the plaintiffs are entitled to judgment in their favor. A separate order shall issue this date in all three cases.